UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:                                          Case No. 8:11-bk-18791-MGW
                                                Chapter 13
Peter Nascarella, Jr.

      Debtor.
_____/

Belmont Wine Exchange, LLC,                     Adv. No. 8:11-ap-01394-MGW

      Plaintiff,

v.

Peter Nascarella, Jr.,

      Defendant.
_____/

## MEMORANDUM OPINION ON MOTION FOR RECONSIDERATION OF SUMMARY JUDGMENT ORDER

The Debtor gave his son some wine and authorized him to sell it through a company the Debtor owned. Belmont Wine Exchange, which bought some of that wine, ultimately obtained a default judgment against the Debtor for fraud. Belmont seeks to have that judgment determined to be nondischargeable under Bankruptcy Code § 523(a)(2)(A). But there is no evidence in the record that the Debtor ever made any misrepresentation—false or otherwise—to Belmont in connection with the sale of wine. The alleged fraud was committed by the Debtor's son. The Court is now asked to decide whether it can impute any fraud that the Debtor's son may have committed to the Debtor (for purposes of determining the dischargeability of Belmont's claim) under the Supreme Court's decision in *Strang v. Bradner*.

The Eleventh Circuit has made clear that *Strang* is limited to the partnership and agency context. Here, there was no partnership or agency relationship between the Debtor and his son.

As a consequence, fraud cannot be imputed to the Debtor under *Strang*. Nor is Belmont's claim rendered nondischargeable merely because the Debtor may have benefitted from the proceeds from the wine sale since there is no evidence that the Debtor committed any fraud. Accordingly, Belmont's § 523 claim is barred as a matter of law.

### Factual Background

<u>The Debtor forms 8501</u>

Sometime around 2006, the Debtor formed 8501, LLC.[1] Although its original purpose is not clear from the record, it appears that 8501 was a real estate venture that was intended to hold the mortgage for a piece of property located at 8501 66th Street North, Pinellas Park, FL.[2] What is clear, however, is that, at some point in 2007, the Debtor authorized his son Peter (who shares the Debtor's first name) to use 8501 to sell wine.[3]

<u>8501 sells wine to Belmont</u>

The wine that Peter was going to sell through 8501 came from the Debtor.[4] The Debtor apparently inherited some wine from his father, and he gave that wine (along with wine that his wife had) to Peter to sell.[5] The wine that the Debtor (and his father and wife) gave to Peter was a gift.[6] Peter, acting on behalf of 8501, contracted to sell 142 bottles of that wine to Belmont for $115,500.[7]

---

[1] Adv. Doc. No. 27-2 at p. 38, ll. 17-18 & p. 38, ll. 3-5.

[2] *Id.* at p. 38, ll. 1-9; Adv. Doc. No. 27-3 at p. 51, ll. 7-10 & p. 52, ll. 15-23; Adv. Doc. No. 42-1 at p. 18, ll. 2-7.

[3] Adv. Doc. No. 42-1 at p. 12, ll. 8-10, p. 18, ll. 10-12 & p. 19, l. – p. 20, l. 8.

[4] Adv. Doc. No. 27-2 at p. 39, ll. 12-16; Adv. Doc. No. 42-1 at p. 12, ll. 8-10 & p. 29, l. 20 – p. 31, l. 1.

[5] Adv. Doc. No. 42-1 at p. 30, l. 23 – p. 31, l. 1 & p. 33, l. 16 – p. 34, l. 9.

[6] *Id.* at p. 31, l. 24 – p. 32, l. 23.

[7] *Id.* at p. 43, l. 23 – p. 45, l. 8; Adv. Doc. No. 27-1 at ¶¶ 1-4; Adv. Doc. No. 42-4.

The wine was delivered to Belmont in two shipments: one on August 22, 2007; the other on October 18, 2007.[8] Belmont paid a total of $74,550 (over three payments in August) before receiving the first shipment.[9] It made three more payments totaling $41,300 before receiving the second shipment of wine.[10] Each of the payments from Belmont (six in all) were by cashier's check and made payable to "8501 LLC" or "Peter Nascarella."[11]

### 8501 disburses at least some of the sales proceeds to Peter

Peter negotiated all six of those payments and deposited them into 8501's account at Wachovia Bank;[12] however, he claims he ultimately received all of the proceeds from the wine that was sold to Belmont.[13] 8501's bank records—offered by Belmont in opposition to summary judgment—do reflect that 8501 made $91,160.65 in disbursements from the time it received Belmont's first payment through the end of October 2007.[14] And of that amount, it is undisputed that at least $55,874.08 went directly to Peter or his wife (Kelly) or to pay for their personal expenses.[15]

All of the disbursements to Peter (or for his personal expenses) were by check and signed by the Debtor since he was the only signatory on the Wachovia account. Peter was not a

---

[8] Adv. Doc. No. 27-1 at ¶¶ 8 & 12.

[9] *Id.* at ¶¶ 5-7.

[10] *Id.* at ¶¶ 9-11.

[11] Adv. Doc. No. 27-4.

[12] Adv. Doc. No. 42-1 at p. 10, l. 21 – p. 11, l. 13 & p. 47, ll. 12-14.

[13] *Id.* at p. 26, l. 11 – p. 27, l. 21.

[14] Adv. Doc. No. 42-8. It appears that from July 1, 2007 through November 23, 2007—the range of bank statements contained in the record—8501 disbursed $128,268.93. *Id.*

[15] Adv. Doc. No. 42-1 at p. 70, l. 8 – p. 81, l. 7; Adv. Doc. No. 42-9 at 6, 15, 24, 31, 33, 58, 59, 63, 69, 89, 95, 105, 106, 109, 135 & 137.

signatory on the Wachovia account. The Debtor apparently gave Peter permission to sign his name.[16] But Peter says he never did so.[17] In any event, it appears from the record that Peter actually made out the checks to him or for his expenses for his father to sign.[18]

Belmont rejects the second shipment

The day after Belmont received the second shipment, it began inspecting the wine.[19] When it did so, Belmont claims it discovered that 8501 failed to deliver the wine that Belmont actually purchased.[20] According to Belmont, 8501 attempted to "pass off" less valuable bottles of wine with names that were deceptively similar to the more valuable bottles of wine that Belmont actually ordered.[21] So Belmont rejected the second shipment and demanded that 8501 refund $105,500.[22]

The parties were ultimately unable to resolve their dispute, which led Belmont to sue Peter (the son, not the Debtor) in state court.[23] Just over a year after filing its lawsuit, Belmont amended its complaint to add the Debtor and 8501 as defendants.[24] The amended complaint

---

[16] *Id.* at p. 9, ll. 10-13.

[17] *Id.* 42-1 at p. 29, ll. 13-19.

[18] *Id.* at p. 22, l. 5 – p. 26, l. 2 & p. 73, ll. 19-22.

[19] Adv. Doc. No. 27-1 at ¶¶ 12 & 13.

[20] *Id.* at ¶¶ 13, 14 & 21.

[21] *Id.* at ¶¶ 13 & 21.

[22] *Id.* at ¶¶ 15-19.

[23] There appears to be some confusion about who Belmont sued. The complaint only names "Peter Nascarella" as the defendant. The Debtor and his son, as mentioned above, share the same first and last name. In either case, it is unnecessary for the Court to resolve that issue.

[24] Adv. Doc. No. 1-1.

included three counts: breach of contract, violation of Florida's Deceptive and Unfair Trade Practices Act, and fraud.[25]

Each of the counts was brought against each defendant.[26] And the allegations of the amended complaint generally lumped all of the defendants together. For instance, Belmont alleged that it entered into a contract with "the defendants"; that "the defendants breached the contract"; that "the defendants attempted to pass off several less valuable wines"; and that "the defendants made multiple intentional and knowing misrepresentations of material fact."[27] What happened after the amended complaint was filed is the subject of much dispute. But suffice it to say, a $130,363.12 default judgment was ultimately entered against all of the defendants on August 4, 2009.[28]

The Debtor files for bankruptcy

For the next two years, Belmont attempt to collect on its judgment. Meanwhile, the Debtor and his son tried to undo it. Peter said a default judgment never should have been entered against him because he had filed an answer to the original complaint. And the Debtor, for his part, says he should have never been named in the suit because he had nothing to do with the sale to Belmont. Unable to undo the judgment, the Debtor filed this bankruptcy case on October 6, 2011.[29]

---

[25] *Id.*

[26] *Id.*

[27] *Id.* at ¶¶ 31, 33, 36 & 41.

[28] Adv. Doc. No. 1-2.

[29] Doc. No. 1.

<u>Belmont seeks to have its claim determined
nondischargeable and objects to the Debtor's discharge.</u>

Shortly after the Debtor filed for bankruptcy, Belmont filed this adversary proceeding

objecting to the Debtor's discharge and asking the Court to determine that its claim is

nondischargeable.[30] Belmont alleged that the Debtor is not entitled to a discharge because he (i)

failed to account for the money he allegedly defrauded from Belmont (Count I); and (ii)

fraudulently transferred assets (a house in Vermont and money in his bank account) to his wife

within a year before the petition date (Count III). Belmont alleged that its debt is

nondischargeable based on the state court judgment for fraud that was entered against the Debtor

(Count II).

The Debtor moved for summary judgment on Belmont's discharge and dischargeability

claims.[31] According to the Debtor, Belmont could not prevail on its discharge claims as a matter

of law because (i) the house in Vermont was originally held as tenants-by-the entirety (so the

Debtor and his wife—not the Debtor alone—transferred the property to the wife); and (ii) it is

not a fraudulent transfer to put money into a spouse's bank account and then use that money to

pay your creditors. [32]

The Debtor argued that Belmont could not prevail on its dischargeability claim as a

matter of law for two reasons.[33] First, he said Belmont's state court judgment was not entitled to

any preclusive effect (i.e., res judicata or collateral estoppel). Second, since the judgment was

not entitled to preclusive effect, Belmont had to prove the Debtor committed some fraudulent

---

[30] Adv. Doc. No. 1.

[31] Adv. Doc. No. 21.

[32] *Id.* at ¶¶ 11 & 12.

[33] *Id.* at ¶¶ 6-9.

act, and the Debtor submitted his own affidavit and an affidavit from Peter swearing that the

Debtor never made any representations to Belmont.[34] Peter swore in his affidavit—and in his

deposition testimony—that he was the only one who dealt with Belmont.[35] Because the Debtor

said he had not actually participated in any fraud, he argued he was entitled to discharge the debt

owed to Belmont as a matter of law.[36]

Belmont filed the affidavit of John Khouri in opposition to the Debtor's summary

judgment motion.[37] According to Belmont, "Khouri's affidavit very clearly laid out the fraud

perpetrated" by the Debtor. In his affidavit, Khouri testified that Belmont ordered 142 bottles of

wine from the Debtor, his son, and 8501; that the wine was ordered as part of a series of e-mails

with the Debtor, his son, and 8501; and that the Debtor tried to "pass off" less valuable bottles of

wine.[38] Belmont also argued that the Debtor must have perpetrated the alleged fraud since he was

the sole member of 8501 and the sole signatory on 8501's bank account.[39]

At the conclusion of the summary judgment hearing, the Court entered summary

judgment in favor of the Debtor on Belmont's discharge claim under § 727(a)(2) because that

section requires Belmont to prove that the *Debtor* transferred an asset, and the undisputed record

evidence was that the house in Vermont was transferred by the Debtor *and his wife since they*

---

[34] *Id.*; Adv. Doc. Nos. 26-1, 39-1 & 40-1.

[35] Adv. Doc. No. 40-1 at ¶¶ 6 & 7; Adv. Doc. No. 42-1 at p. 13, ll. 11-15 & p. 14, l. 24 – p. 15, l. 1.

[36] Adv. Doc. No. 21 at ¶¶ 6-9 & 13.

[37] Adv. Doc. No. 27-1.

[38] Adv. Doc. No. 27 at ¶¶ 2-4 & 21-28.

[39] Adv. Doc. No. 27.

*held it as tenants-by-the entirety.*[40] The Court also granted summary judgment in favor of the

Debtor on Belmont's dischargeability claim under § 523(a)(2) and (4).[41]

In articulating its reasoning, the Court first observed that res judicata does not apply in

actions under § 523.[42] Collateral estoppel, however, does apply where (i) the issues at stake are

identical; (ii) the issue was actually litigated; (iii) the determination of the issue was a "critical

and necessary" part of the state court judgment; and (iv) the party against whom the judgment is

asserted had a full and fair opportunity to litigate the issue in the prior proceeding. But there was

no evidence here that the finding of fraud was "critical and necessary" to the state-court

judgment against the Debtor because the allegations in the underlying state court complaint do

not specifically identify which of the defendants (the Debtor, his son, or 8501) made the alleged

fraudulent misrepresentations.[43] Without specific allegations as to who made the false

representations, the Court could not determine whether any finding of fraud was a critical and

necessary part of the state court judgment against the Debtor in order to apply the doctrine of

collateral estoppel.[44]

Therefore, the Court was required to look to the record evidence in this case anew to

determine if the Debtor committed fraud.[45] And the Court determined there was no record

---

[40] Adv. Doc. No. 44; Adv. Doc. No. 56 at pp. 42-43.

[41] Adv. Doc. No. 44; Adv. Doc. No. 56 at pp. 38-42.

[42] Adv. Doc. No. 56 at 38-39; *Brown v. Felsen*, 442 U.S. 127 (1979).

[43] Adv. Doc. No. 56 at 39-40.

[44] There is another reason collateral estoppel does not apply. Where the complaint in the prior proceeding contains multiple causes of action, but the final judgment awards only a single monetary amount without designating the cause of action that the award relates to or specifying a basis for the award, it cannot be known whether any particular cause of action was "essential" to the final judgment. Here, the state court judgment says Belmont was the "prevailing party to this action on all counts of the Amended Complaint." *Dimmit & Owens Fin., Inc. v. Green (In re Green)*, 262 B.R. 557, 567 (Bankr. M.D. Fla. 2001).

[45] Adv. Doc. No. 56 at 41-43.

evidence that the Debtor committed any actual fraud. On the one hand, both the Debtor and his son filed affidavits saying the Debtor never communicated with Belmont. They both say that only Peter did. On the other hand, Belmont submitted an affidavit that—like the state court complaint—lumped the Debtor and his son together. It, of course, goes without saying that the Debtor, his son, and 8501 did not all make the same representations at the same to Belmont, as Khouri's affidavit suggests. Nowhere in his affidavit, does Khouri ever say the *Debtor* specifically misrepresented to him the quality of the wine that Belmont was purchasing. Because Belmont failed to offer any evidence that the Debtor made a misrepresentation, the Court granted summary judgment in favor of the Debtor.[46]

Belmont now seeks reconsideration of this Court's summary judgment ruling for two reasons.[47] First, Belmont says the Court overlooked the Supreme Court's 127-year-old decision in *Strang v. Bradner* (and the numerous cases that have followed it) holding that the fraud of a guilty partner could be imputed to an innocent Debtor—thereby rendering a debt nondischargeable under § 523(a)(2) even though the Debtor did not commit any actual fraud.[48] Second, Belmont says the Court overlooked evidence in the record showing that the Debtor committed actual fraud (even if he did not make any misrepresentations).[49] Belmont is wrong on both counts.

---

[46] *Id.*

[47] Adv. Doc. No. 46.

[48] *Id.* at 1-5.

[49] *Id.* at 5-15.

**Conclusions of Law**[50]

The Court did not overlook the Supreme Court's decision in *Strang*. For starters, an argument cannot be overlooked if it was never raised in the first place. Belmont claims in its motion for reconsideration that it argued repeatedly—both in its filings and at the summary judgment hearing—that the Debtor can be liable for fraud regardless of whether he personally made the misrepresentations that form the basis of Belmont's fraud claim.[51] In actuality, Belmont never raised that argument in its initial or supplemental response to the Debtor's summary judgment motion.[52] Nor did Belmont raise this argument at the summary judgment hearing.[53] The first time that Belmont raised that argument (or the *Strang* decision) was in its motion for reconsideration.

The argument could have—indeed it should have—been raised previously. After all, the entire basis of the Debtor's summary judgment motion (at least as to the claim under § 523) was that he never made any representations—fraudulent or otherwise—to Belmont. Rather than argue that it did not matter whether the Debtor made the misrepresentations, Belmont persisted in arguing that he did.

In fact, once the Court orally announced its ruling at the conclusion of the summary judgment hearing, Belmont's counsel asked the Court if it could submit supplemental authority for the proposition that a debt is nondischargeable—without proof of actual misrepresentations by the debtor—if a creditor shows that a corporate entity committed a fraud and that the debtor

---

[50] The Court has jurisdiction over this contested matter under 28 U.S.C. § 1334.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) & (J).

[51] Adv. Doc. No. 46 at 2.

[52] Adv. Doc. Nos. 25 & 27.

[53] Adv. Doc. No. 56.

was the "sole potential actor" on behalf of the corporation.[54] Of course, the Debtor was not—as

the Court pointed out—the sole potential actor. The only potential—and, in fact, actual—actor

was Peter. In any case, Belmont never raised *Strang* or the argument it now raises in its motion

for reconsideration.

A motion for reconsideration is not a vehicle for disappointed parties to relitigate

previously-decided issues by raising new theories.[55] Nor can a motion for reconsideration be

used to make additional arguments not previously raised by counsel.[56] Yet, that is exactly what

Belmont is doing here. For that reason alone, Belmont's motion should be denied. But even if

Belmont had raised the argument, the Court's ruling would have been the same.

That is because *Strang* and its progeny are not applicable here. The issue in *Strang* was

whether a cause of action under a promissory note had been discharged in a previous bankruptcy

case.[57] The plaintiffs argued that the debt was nondischargeable because it arose out of a fraud

committed by the defendants' partner, Strang. There was no real question that Strang had

defrauded the plaintiffs; however, there was no evidence that the defendants directed or knew

about Strang's misrepresentations.[58] The Supreme Court held that Strang's fraud could be

imputed to his innocent partners.[59]

That holding was specifically premised on partnership and agency law. The Court noted

that if one partner makes fraudulent misrepresentations to an innocent person in the course of

---

[54] *Id.* at 45-46.

[55] *In re Waczewski* 2005 WL 1330691, at *1 (Bankr. M.D. Fla. 2005) (Jennemann, J.).

[56] *Id.* (citing *In re Investors Florida Aggressive Growth Fund, Ltd.*, 168 B.R. 760, 768 (Bankr. N.D. Fla. 1994)).

[57] *Strang v. Bradner*, 114 U.S. 555, 560-61 (1885).

[58] *Id.* at 559-60.

[59] *Id.* at 561.

partnership business, the remaining partners cannot escape liability by claiming they did not know about the misrepresentations.[60] That is especially true where the innocent partners reap the benefits of the guilty partner's fraud.[61] Since Strang made the misrepresentations during the course of partnership business, the fraud should be imputed to his innocent partners.

Numerous courts since *Strang* have held that the fraudulent acts of a partner could be imputed to a debtor in determining whether a debt is nondischargeable under § 523(a)(2).[62] Other courts have imputed fraudulent acts of an agent to an innocent debtor.[63] In fact, all of the cases cited by Belmont (it string cites 11 in all) involve imputing the fraud of a partner or agent to an innocent debtor.[64] But Peter (the person who allegedly made the misrepresentations here) was not the Debtor's partner or agent.

Belmont concedes in its motion for reconsideration that the most important test for determining the existence of a partnership is the intent of the parties. Belmont, however, fails to point to any record evidence demonstrating that the Debtor and his son intended to be partners. The only record evidence that Belmont does point to is the fact that (i) the Debtor formed the limited liability company that was ultimately used to sell the wine; (ii) the Debtor provided the wine that was sold to Belmont; and (iii) the Debtor's son provided the labor in selling the wine.

---

[60] *Id.*

[61] *Id.*

[62] Adv. Doc. No. 46 at 3-4 (citing *BancBoston Mtg. Corp. v. Ledford (In re Ledford)*, 970 F.2d 1556-62 (6th Cir. 1992); *Impulsora del Territorio Sur, S.A. v. Cecchini (In re Cecchini)*, 780 F.2d 1440, 1443 (9th Cir. 1986); *Moore v. Gill (In re Gill)*, 181 B.R. 666, 673-74 (Bankr. N.D. Ga. 1995); *Terminal Builder Mart of Piedmont, Inc. v. Warren (In re Warren)*, 7 B.R. 571, 573 (Bankr. N.D. Ala. 1980)).

[63] *Id.* (citing *W-V Enters., Inc. v. Croft (In re Croft)*, 150 B.R. 955, 958 (Bankr. E.D. Mo. 1993); *Love v. Smith (In re Smith)*, 98 B.R. 423, 426 (Bankr. C.D. Ill. 1989); *Citizens State Bank of Maryville v. Walker (In re Walker)*, 53 B.R. 174, 179 (Bankr. W.D. Mo. 1985)).

[64] *Id.*

The fact that the Debtor allowed his son to sell wine he gave him through his limited liability company does not indicate the parties intended to carry on as co-owners of a business for profit.

A partnership is created only where both parties contribute to the labor or capital, have a mutuality of interest in both profits and losses, and agree to share in the assets and liabilities of the business. Here, none of those three factors are present.[65] The Debtor gave the wine to his son as a gift. Peter was free to do with it what he pleased. There is no evidence the Debtor and his son agreed to share in any profits from the sale of the wine. The record evidence is to the contrary: the parties agreed that Peter could keep the proceeds. And there is no record evidence that the parties agreed to share in the assets and liabilities of 8501 or any other business. Since none of those factors are present, the Debtor and his son did not form a partnership as a matter of law.

Nor is Peter the Debtor's agent as a matter of law. An agency relationship may be established expressly or by estoppel (i.e., an apparent agency relationship). The standard for determining whether an agency relationship exists is whether the purported principal has control over the alleged agent.[66] In order for an agency relationship to exist, there must be some affirmative evidence that the principal has the right to control the agent.[67] The party who seeks to establish the existence of an agency relationship bears the burden of proof.[68] And here, Belmont has failed to provide any evidence that the Debtor had the right to control Peter.

---

[65] *Berger v. Hartley*, 896 F. Supp. 2d 1157, 1167 (S.D. Fla. 2012); *Bar-Am v. Grosman (In re Grosman)*, 2007 WL 1526701, at * 14 (Bankr. M.D. Fla. May 22, 2007) (Jennemann, J.).

[66] *Belik v. Carlson Travel Group, Inc.*, 864 F. Supp. 2d 1302, 1310-11(S.D. Fla. 2011); *Vermeulen v. Worldwide Holidays, Inc.*, 922 So. 2d 271, 274-75 (Fla. 3d DCA 2006); *Chase Manhattan Mortg. Corp. v. Scott, Royce, Harris, Bryan Barra, Jorgensen, P.A.*, 694 So. 2d 827, 832 (Fla. 4th DCA 1997).

[67] *Belik*, 864 F. Supp. 2d at 1310-11; *Vermeulen*, 922 So. 2d at 274-75; *Chase Manhattan Mortg. Corp.*, 694 So. 2d at 832.

[68] *Chase Manhattan Mortg. Corp.*, 694 So. 2d at 832.

Peter may have been *8501*'s actual or apparent agent. The Debtor (who appears to be 8501's sole member) did authorize Peter to sell wine through the company. So the Debtor knowingly permitted Peter to act as if he was authorized by 8501. And there does not appear to be any dispute that Belmont believed Peter was authorized to act on behalf of the company. Of course, establishing an agency relationship—actual or apparent—with 8501 does not help Belmont. It does no good for Belmont to impute fraud to 8501 since the company is not the debtor.

In reality, Belmont is attempting to impute the fraud of 8501's agent to its sole member. Belmont's argument essentially is that Peter defrauded Belmont; 8501 is liable for any fraud committed by Peter since Peter had, at a minimum, apparent (if not actual) authority to act on its behalf; and the Debtor is liable for that fraud since he is 8501's sole member. Numerous courts, however, have refused to impute fraud to a debtor outside of traditional partnership or agency relationships.[69]

In fact, the bankruptcy court for the district of New Mexico, in *In re Bruton*, refused to impute fraud to an owner of a limited liability company based on facts similar to those in this case.[70] There, First New Mexico Bank sued David and Charlene Bruton (the debtors) to have its claim determined to be nondischargeable under § 523(a)(2)(A). According to the evidence in the record, the Brutons owned Sure Printing & Signs, LLC.[71] Sure Printing borrowed $60,000 from the Bank and granted the Bank a security interest in its assets to secure its loan obligations. Sure

---

[69] *See, e.g., RecoverEdge, LP v. Pentecost*, 44 F.3d 1284, 1287 (5th Cir. 1995); *Columbia State Bank v. Daviscourt (In re Daviscourt)*, 353 B.R. 674, 686-87 (10th Cir. BAP 2006); *Porter Capital Corp. v. Campbell (In re Campbell)*, 2008 WL 4682785, at *4-5 (Bankr. E.D. Tenn. Oct. 21, 2008); *Bank of Washington Cty. v. Wright (In re Wright)*, 299 B.R. 648, 658 (Bankr. M.D. Ga. 2003).

[70] *First New Mexico Bank v. Bruton (In re Bruton)*, 2010 WL 2737201, at *5-6 (Bankr. D.N.M. Jul. 12, 2010).

[71] *Id.* at 2-3.

Printing apparently sold its business (including all of the assets subject to the Bank's security interest) to a third party.

David Bruton represented to the Bank that the sale price was sufficient to pay off the loan balance. He paid the Bank $15,000 upfront and explained that he would pay off the loan balance when he received the rest of the sales proceeds. In fact, the sales price was not sufficient to pay off the loan balance. Had the Bank known that, it would have taken some action to protect its interest. When the Brutons ultimately filed for bankruptcy, the Bank filed its dischargeability action.

The dischargeability action was brought against both David and Charlene even though it was undisputed that Charlene did not actively participate in the business; did not sign the loan or security agreement; did not participate in the sale of the business; and did not make any affirmative misrepresentations to the Bank.[72] The Bank's nondischargeability claim against Charlene was based solely on her status as a member of Sure Printing. As a consequence, the Bank could only prevail on its claim against Charlene if David's fraud could be imputed to her.[73]

At the outset, the *Bruton* court acknowledged that it is possible, under certain circumstances, to impute liability to parties who did not actively participate in alleged wrongdoing.[74] But it noted that all of the decisions imputing fraud to an innocent party came up in the partnership or agency context.[75] That is because courts that have imputed liability to an innocent party have looked to state law to determine if the innocent party would be jointly and severally liable with the wrongdoing party, and under state partnership law, partners are jointly

---

[72] *Id.* at 4.

[73] *Id.*

[74] *Id.* at 5.

[75] *Id.*

and severally liable for the debts incurred by the other partners in the course of partnership business.[76]

The law is different, however, for corporations and limited liability companies. As the *Bruton* court recognized, corporations and limited liability companies—unlike partnerships—generally protect shareholders or members from liability unless they actively participated in the wrongful act.[77] Since there was no evidence that Charlene actively participated in the wrongful act, the *Bruton* court held that the Bank could not prevail on its § 523 claim against her as a matter of law if, in fact, Sure Printing was a limited liability company at all material times.

The Court noted that imputing David's fraud to Charlene based solely on her status as a member of a limited liability company would be inconsistent with the intent of § 523:

> Holding a debtor liable for the fraudulent acts of another party when there has been no allegation of a partnership or agency relationship is "inconsistent with the general principle that § 523(a)(2)(A) 'contemplates frauds involving moral turpitude or intentional wrong; fraud implied in law which may exist without imputation of bad faith or immorality, is insufficient.'"[78]

While the Eleventh Circuit has not addressed this issue in the context of imputing fraud to an innocent member of a limited liability company, it expressly refused to extend *Strang* beyond the partnership or agency context in *In re Villa*.[79]

There, Donald Hoffend (an investor) sought to have his claim against the debtor, which was based on a violation of federal securities law, determined to be nondischargeable under § 523(a)(2)(A). Hoffend conceded that the debtor had not made any false misrepresentations. But

---

[76] *Id.*

[77] *Id.*

[78] *Id.* (quoting *RecoverEdge, LP v. Pentecost*, 44 F.3d 1284, 1297 (5th Cir. 1995)).

[79] *Hoffend v. Villa (In re Villa)*, 261 F.3d 1148 (11th Cir. 2001).

he alleged that the debtor was liable for the fraud committed by the employees of his brokerage firm (the debtor was the sole shareholder of the brokerage firm) as a "controlling person" under § 20(a) of the Securities and Exchange Act. The *Villa* court initially noted that, under the Supreme Court's decision in *Neal v. Clark*, a debt did not fall within § 523(a)(2)(A) unless the debtor committed positive, actual fraud.[80]

The *Villa* court then noted that *Strang* stands for the proposition that *Neal*'s "positive fraud" requirement can be satisfied by the fraud of a debtor's partner.[81] Reading *Neal* and *Strang* together, the *Villa* court explained that a debt may be excepted from discharge when the debtor commits actual, positive fraud or where actual fraud is imputed to the debtor under agency principles.[82] And according to the *Villa* court, fraud can be imputed to the debtor where the debtor would be liable for another's fraud.

But the *Villa* court held that the fraud of the brokerage firm's employees could not be imputed to the debtor in that case because liability under § 20(a) was not equivalent to liability under partnership law or agency principles:

> [W]e are bound to a narrow reading of *Strang*. *Strang* imputed liability for fraud in bankruptcy based on the common law of partnership and agency. In the instant case, there is no suggestion that [the debtor] and [the brokerage firm] were partners, so partnership law, as applied in *Strang*, is inapplicable in this case. . . . [T]o hold that § 20(a) liability may render a debt nondischargeable under § 523(a)(2)(A) would be to extend the holding of *Strang* beyond its basis in agency law. We conclude that the potential scope of § 20(a) liability does not fall within a narrow reading of *Strang*.[83]

---

[80] *Id.* at 1150-51.

[81] *Id.* at 1151.

[82] *Id.*

[83] *Id.* at 1152-53.

In reaching its holding, the Eleventh Circuit expressly noted that it was mindful of its obligation to strictly construe exceptions to discharge in order to give effect to the "fresh start" policy in bankruptcy.[84]

This Court is bound to follow Eleventh Circuit precedent. And while the facts in *Villa* are not directly on point, the Eleventh Circuit's reasoning in that case is: *Strang* should not be extended beyond its basis in agency law. And by imputing Peter's alleged fraud to the Debtor, that is precisely what the Court would be doing. Accordingly, the *Strang* decision does not warrant this Court reconsidering its summary judgment ruling.

The only plausible argument for the Court to reconsider its ruling (absent evidence that the Debtor actually committed fraud) is a line of cases suggesting—at least on their face—that a debt is nondischargeable if the debtor benefits in any way from money obtained through deception. There is some evidence in this case, after all, that the Debtor may have benefitted from Peter's alleged fraud.[85] The Debtor testified that he used money from 8501's account to pay his own personal expenses. The leading case for the proposition that a debt is nondischargeable if the debtor benefitted from money obtained through fraud is Judge Paskay's decision in *In re Holwerda*.[86]

There, the debtor (who was one of three principals of Range Corporation) prepared a fraudulent financial statement that was submitted to Century Bank in connection with a loan application. The debtor gave conflicting testimony about whether he had given the fraudulent statement to the Bank. During his 341 meeting, he testified that he did. At trial, however, he

---

[84] *Id.* at 1153-54.

[85] Adv. Doc. No. 27-2 at p. 41, ll. 20-25 & p. 47, l. 16 – p. 49, l. 11.

[86] *Century First Nat'l Bank v. Holwerda (In re Holwerda)*, 29 B.R. 486 (Bankr. M.D. Fla. 1983) (Paskay, J.).

testified that he left the false statement with his brother (another Range Corporation principal), who gave the statement to the Bank. In either case, there was no dispute that the Debtor prepared the false financial statement, the statement was given to the Bank, and the Bank loaned Range Corporation $50,000 based on that statement.

In considering the Bank's claim under § 523(a)(2)(B), Judge Paskay noted that there was a split of authority regarding what constitutes "obtaining money" under that section.[87] One line of cases interpreted that element to mean that a debt was nondischargeable only if the debtor actually obtained money for *himself* through false representations.[88] According to Judge Paskay, the better view was that the debtor need not actually procure the money for himself so long as he benefitted in some way from his deception.[89]

In *Holwerda*, the debtor benefitted from his deception even though he did not procure money for himself. That is because he used his false statement to procure money for Range Corporation. And he was one of only three principals of Range Corporation. The Fifth Circuit, in *In re Luce*, relied on *Holwerda* for the proposition that a debt is dischargeable if the debtor benefitted from money obtained through fraud.[90]

*Luce*, however, misconstrues *Holwerda*. *Luce* cites *Holwerda* for the proposition that a "debt is nondischargeable '[i]f the debtor benefits in some way' from the money, property, services or credit obtained *through deception*."[91] But the *Luce* court overlooks a crucial word in Judge Paskay's formulation: "his." Judge Paskay, in *Holwerda*, held that a debt is

---

[87] *Id.* at 488-89.

[88] *Id.* at 489.

[89] *Id.*

[90] *In re Luce*, 960 F.2d 1277 (5th 1992).

[91] *Id.* at 1287 (quoting *Holwerda*, 29 B.R. at 489).

nondischargeable "only if the debtor benefits in some from property obtained through *his deception*."[92] In *Holwerda*, the money that the debtor benefitted from was obtained by his own deception—not someone else's. That was not the case in *Luce*. *Holwerda* did not consider whether a debt is dischargeable if a debtor benefits in some way from the fraud of another. In any case, *Luce*'s reliance on *Holwerda* (and its statement that a debt is dischargeable if the debtor benefits from the money obtained) is dicta since it was a partnership case, and fraud could be imputed against the innocent debtor under *Strang*.[93]

Here, to the extent the Debtor benefitted from any of the proceeds of the sale of wine, those proceeds were not obtained through *his own* deception. As discussed above, there is no record evidence that the Debtor made any fraudulent misrepresentations to Belmont. The Court is unaware of any binding precedent—outside the partnership or agency context—holding that a debt is dischargeable simply because the debtor benefits in some way from money obtained through the fraud of another. Accordingly, the mere fact that the Debtor may have benefitted from the sale proceeds does not, by itself, render Belmont's debt nondischargeable.

That brings the Court to Belmont's second argument: the Court overlooked evidence of actual fraud by the Debtor. In its motion for reconsideration, Belmont points to a list of facts showing that:

- the Debtor  formed a "shell company" (8501) and authorized Peter to sell wine on behalf of the company;

- 8501 had no employees;

- the Debtor supplied the wine that was ultimately sold to Belmont;

---

[92] *Holwerda*, 29 B.R. at 489.

[93] *Luce*, 960 F.2d at 1282-83.

- there was a substantial disparity between the value of the wine that the Debtor gave his son and the price that Belmont paid for that wine; and,

- the Debtor was spent some (or all) of the money defrauded from Belmont (including gambling away some of that money).[94]

Belmont says those facts, along with the facts set forth in Khouri's affidavit, show that the Debtor used 8501 to perpetrate a fraud. To be sure, the Court is required to construe all evidence in the light most favorable to Belmont.

But Belmont misconstrues a number of facts in the record. For instance, Belmont says the Debtor acknowledged receiving checks from Belmont.[95] In the transcript cited by Belmont, the Debtor actually testified that he did not receive the checks personally and did not remember who did.[96] Belmont also says the Debtor admitted supplying "the inferior wine" that "he and his son" attempted to "pass off" to Belmont.[97] Although the Debtor testified that he gave wine to his son, he never admitted it was "inferior" or that he attempted to "pass it off" to Belmont. The evidence that Belmont misconstrues goes to the heart of its claim.

The reality is that is there is no evidence that the wine that the Debtor gave to his son, which was ultimately sold to Belmont, was "inferior." It may not have been as valuable as Peter represented to Belmont, but there is no evidence that the Debtor knew Peter intended to—or, in fact, did—misrepresent the value of the wine to Belmont. Nor is there any evidence that the Debtor knew about any issues with the wine until he was added as a defendant to the state court lawsuit.

---

[94] Adv. Doc. No. 46 at 7-14.

[95] *Id.* 46 at 7.

[96] Adv. Doc. No. 27-2 at p. 37, ll. 7-18.

[97] Adv. Doc. No. 46 at 7.

Without any of that evidence, a jury could not—as Belmont suggests—return a verdict in favor of Belmont on its claim that the Debtor participated in a fraudulent scheme. All the evidence shows is that the Debtor set up a company (most likely to use for a real estate investment); the Debtor later allowed his son to use the company to sell wine that the Debtor gave him; and the Debtor's son may have—unbeknownst to his father—defrauded Belmont in connection with the sale of that wine. That is a far cry from what is required under § 523. Accordingly, the Court did not overlook any facts showing that the Debtor committed actual fraud.

### Conclusion

As the Eleventh Circuit observed in *Villa*, this Court is bound by a narrow reading of *Strang*. Moreover, the Court is required to narrowly construe § 523(a)(2) in order to give effect to the Bankruptcy Code's policy of providing debtors with a "fresh start." Accordingly, the Court will not reconsider its prior summary judgment ruling in favor of the Debtor on Belmont's claim under § 523. The Court will deny Belmont's motion for reconsideration by separate order.

**DATED** in Chambers at Tampa, Florida, on _____May 10, 2013_____.

Michael G. Williamson
United States Bankruptcy Judge

Attorney Jawdet I. Rubaii is directed to serve a copy of this order on interested parties and file a proof of service within 3 days of entry of the order.